IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JOSHUA DUPAGE,<br>    Plaintiff,<br><br>v.<br><br>BUTLER et al,<br>    Defendants. | Case No. 1:19-cv-01021-JEH |

**Order**

Now before the Court is the Defendant Pekin Police Officer Brett Butler's Motion for Summary Judgment (D. 133) and the Plaintiff's Motions for a Stay (D. 148) and an Extension of Time (D. 150).[1] For the reasons set forth *infra*, the Defendant's Motion is granted and the Plaintiff's Motions are denied.

**I**

Plaintiff, a *pro se* prisoner, began the instant case on January 17, 2019. (D. 1). On March 13, 2023, the Plaintiff filed the operative Seven Count Amended Complaint against the Defendant Butler and the City of Pekin, Illinois. (D. 89). The Defendants moved to dismiss Counts One, Two, Four, Five, Six, and Seven for failing to state a claim (D. 92).[2] On May 16, 2023, the Court denied the Motion as to Counts One and Two, dismissed Counts Five and Six as redundant, and granted dismissal of Counts Four and Seven with leave to re-plead within twenty-one days. (D. 96 at ECF p. 15-16). On June 26, 2023, and on July 17, 2023, the Plaintiff withdrew his intent to file a Second Amended Complaint. (D. 101 & 103). On

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."
[2] The Defendant Butler did not move to dismiss Count Three. (D. 107 at ECF p. 2 fn. 2).

1

September 27, 2023, the Court granted the Defendant's Motion to Terminate the City of Pekin as a Defendant (D. 120), leaving only Defendant Butler and Counts One, Two, and Three remaining. *Id.* at ECF p. 2-3. On February 7, 2025, the Defendant Butler filed a Motion for Summary Judgment. (D. 133). On February 26, 2025, the Court granted the Plaintiff an extension to file a Response to the Motion for Summary Judgment by March 26, 2025. *See* 02/26/2025 Text Order. On March 28, 2025, the Court granted the Plaintiff another extension to file a Response by May 27, 2025, and instructed the Defendant to resend its Motion for Summary Judgment to the Plaintiff. *See* 03/28/2025 Text Order. On May 13, 2025, the Court granted the Plaintiff another extension to file a Response by June 27, 2025. *See* 05/13/2025 Text Order. On June 17, 2025, the Court granted the Plaintiff another extension to file a Response by July 4, 2025, and warned the Plaintiff that if he does not respond, the Court may proceed to rule on the Motion for Summary Judgment. *See* 06/17/2025 Text Order. On July 8, 2025, in light of the circumstances raised in Plaintiff's request, the Court granted Plaintiff another extension to file a Response to the Motion for Summary Judgment by August 8, 2025. *See* 07/08/2025 Text Order. The Court also warned the Plaintiff that any further requests for an extension of time to respond would be denied and directed the Clerk of the Court to mail the Motion for Summary Judgment to the Plaintiff along with a copy of the Order. *Id.* On July 17, 2025, the Plaintiff requested a stay of the case to which the Defendant filed its Response on July 18, 2025. (D. 148 & 149). On August 5, 2025, the Plaintiff filed a Motion for an Extension of Time to which the Defendant filed its Response on August 7, 2025. (D. 150 & 151).

## II

Under the Local Rules in this District, Motions for Extensions of Time to file a Response "will not be looked upon with favor". Civil LR 7.1(D). On June 17, 2025, the Court warned the Plaintiff that if he does not file a Response, the Court may

proceed to rule on the Motion for Summary Judgment. *See* 06/17/2025 Text Order. The Court also warned the Plaintiff that, although he is *pro se,* he still must comply with the Local Rules. *Id.* To date, the Court has granted the Plaintiff five extensions of time to file a Response to the Defendant's Motion for Summary Judgment, which was first filed on February 7, 2025, in a case that has been ongoing since 2019. *See* 02/26/2025 Text Order; 03/28/2025 Text Order; 05/13/2025 Text Order; 06/17/2025 Text Order; *See* 07/08/2025 Text Order. On March 28, 2025, the Court directed the Defendant to resend its Motion for Summary Judgment to the Plaintiff to ensure his ability to respond. *See* 03/28/2025 Text Order. On June 17, 2025, the Court warned the Plaintiff that if he does not respond, the Court may proceed to rule on the Motion for Summary Judgment. *See* 06/17/2025 Text Order. On July 8, 2025, the Court advised the Plaintiff that any further "requests for an extension of time to respond will be denied" and directed the Clerk of the Court to mail the Motion for Summary Judgment to the Plaintiff along with a copy of the Court's Order. *See* 07/08/2025 Text Order. On July 17, 2024, Plaintiff requested a stay for an indefinite amount of time. (D. 148 at ECF p. 3). On August 5, 2025, the Plaintiff withdrew his request for a stay and instead requested another thirty to forty-five days to respond. (D. 150 at ECF p. 1). However, given that over six years has passed in this case, along with the Court's multiple grants of extensions of time and attempts to provide the Plaintiff with copies of the Motion for Summary Judgment to ensure the Plaintiff has an opportunity to respond, the Court denies the instant request as Plaintiff has not demonstrated good cause. FED. R. CIV. P. 6(b); Civil LR 7.1(D). Accordingly, in light of the Plaintiff's failure to Respond, the Court proceeds to rule on the Defendant's Motion for Summary Judgment (D. 133) as the matter is now fully briefed.

### III

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrate that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993). "The parties must support their assertions that a fact cannot be or is genuinely disputed by citing to 'particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . ..'" *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477

U.S. at 255 (1986). In "a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).  Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 250. In this case, the deadline for Plaintiff's Response was August 8, 2025, *See* 07/08/2025 Text Order, and because the Plaintiff has not Responded, the Court will accept the Defendant's statement of facts as undisputed for purposes of ruling on the Motion.[3] FED. R. CIV. P. 56(e)(2),(3). They are as follows.

Defendant Butler is a police officer employed by the Pekin Police Department. (D. 133 at ECF p. 5). On February 9, 2018, at 12:37 AM, the Defendant was "on duty and patrolling the streets of Pekin, Illinois in his squad car," when he observed the Plaintiff walking on Derby Street. *Id.* On that day, Butler was aware that Debry Street is an area "where many service calls, drug arrests, and drug activity had occurred in the past." *Id.* Butler also had "prior familiarity with DuPage due to several prior police contacts, including DuPage's arrest one month earlier in January 2018 by the Pekin Police Department for possession of methamphetamine and drug equipment." *Id.* Moreover, Butler "was aware the Creve Coeur Police department had a 'stop and hold' request for DuPage for an incident where DuPage was suspected of doing a drive-by shooting" and was aware that "he had been previously involved in a no-knock search warrant at DuPage's resident in April 2017, where methamphetamine, pills, single small plastic baggies, torn baggies, and a stolen laptop were found and that DuPage had

---

[3] The Plaintiff was sent a Rule 56 Notice by the Clerk of Court on February 7, 2025, which explained the consequences of failing to respond to the Motion for Summary Judgment. (D. 134).

given a post-Miranda interview at that time where he admitted to trafficking in methamphetamine." *Id.* at ECF p. 6. When Butler encountered DuPage on February 9, 2018, Pekin Police Department officers "had been advised to use caution if ever encountering DuPage because DuPage was a known drug dealer who was also known to carry a gun." *Id.* Butler also knew "that [because] DuPage was a convicted felon, he . . . could not lawfully possess a firearm." *Id.*

When Butler observed DuPage, he "parked his fully marked squad car" and "radioed dispatch to check to see if DuPage had any warrants for his arrest before exiting his squad car."[4] *Id.* Butler then "exited his squad car without activating his emergency lights or sirens" and "approached DuPage by himself without his service weapon or Taser drawn." *Id.* at ECF p. 7. He asked "DuPage if he had a minute to talk; DuPage stopped walking, asked what Officer Butler wanted to talk about, and then proceeded to voluntarily converse with Officer Butler." *Id.* Butler "noticed that DuPage had one hand on the outside of his jacket as if he was holding something in place that was in his jacket." *Id.* "Officer Butler asked DuPage what his bond was on his most recent methamphetamine arrest in January 2018. DuPage replied that he had to post $500 and was out the same day." *Id.* "While DuPage was voluntarily conversing with Officer Butler, Officer Butler was notified by Pekin Police Department dispatch that the information he had requested regarding DuPage was ready." *Id.* Butler removed himself from "DuPage's earshot" and dispatch then advised him that "DuPage had a valid arrest warrant from Peoria County for failure to appear on a traffic offense." *Id.* Butler was aware that "an arrest warrant issued by an Illinois court may be executed by an Illinois police officer anywhere in the state" and that "part of his job . . . was to arrest

---

[4] "At no point on February 9, 2018 did Officer Butler personally utilize the Law Enforcement Agencies Data System ("LEADS") to investigate DuPage" though "any officer, including Officer Butler, can use LEADS when performing official duties as a police officer." *Id.* at ECF p. 11.

6

subjects with warrants." *Id.* Butler chose not to arrest DuPage immediately and instead request backup because "DuPage was known to carry a gun in the past and appeared to [be] covering up his front pocket, [and] Officer Butler did not want to risk his safety by arresting DuPage without backup officers present." *Id.* at ECF p. 8. He continued to converse with DuPage while he waited for backup and noticed DuPage appeared nervous and instructed him to "remove his hands from his pockets multiple times." *Id.* Butler observed DuPage fidgeting and "looking behind him as if he wanted to start running" and informed DuPage "he was not free to go because he was checking to see if [he had] an active warrant" in order to stall "until backup could arrive." *Id.* Butler states at "no point did [he] tell DuPage he was not free to go prior to dispatch informing Officer Butler of the valid warrant." *Id.* While waiting for backup, "DuPage kept giving . . . nonverbal cues that he was going to run . . . .." *Id.* Butler told DuPage he was not free to go. *Id.*

"DuPage suddenly turned around and began to run to the west, placing one hand in his jacket pocket." *Id.* Butler "was able to quickly grab DuPage by the back of his jacket collar, get him to the ground, and detain him at [t]aser point." *Id.* at ECF p. 9. Butler then instructed "DuPage [to] get onto his knees and put his hands on top of his head" and "told DuPage not to remove his hands from atop his head." *Id.* "While keeping DuPage at [t]aser point, Officer Butler requested dispatch expedite backup to his location. *Id.* Butler states "DuPage kept trying to turn around and talk to [him]" and continued fidgeting and disobeying Butler's instructions that he look forward. *Id.* In response, for his own safety, Butler handcuffed DuPage and then "asked him what he was reaching for in his pocket" to which DuPage replied that he "had a gun in his pocket." *Id.* Butler then "removed a black pistol from DuPage's right front pocket" and "threw it on the

7

ground" outside of DuPage's reach.[5] *Id.* Butler asked DuPage where any methamphetamine was and DuPage stated it was in his other pocket. *Id.* Butler then removed "two smaller baggies of methamphetamine and another baggie of white pills (later determined to be 58 lorazepam pills)."[6] *Id.*

When backup arrived and DuPage was more fully secure, Butler further searched DuPage's person. *Id.* at ECF p. 10. "In DuPage's remaining pockets, Officer Butler located a purple canister containing a large variety of pills, another plastic baggie of methamphetamine, a digital scale, a black cell phone, two other electronic devices, and DuPage's wallet which contained $1,603.00 cash." *Id.* "Officer Butler placed DuPage under arrest for the outstanding Peoria County traffic warrant" and "unlawful possession of a firearm by a felon, possession of methamphetamine, possession of methamphetamine with intent to deliver, possession of a controlled substance, resisting arrest, and possession of drug equipment." *Id.* Butler states that at no point were the handcuffs oversecured and at no point "did DuPage complain to Butler that the handcuffs were causing him pain . . .." *Id.* at ECF p. 11.

Butler then authored an "Incident/Investigation Report describing the encounter" and DuPage was later "indicted in federal court for possession of methamphetamine with intent to distribute, felon in possession of a firearm, and possession of a firearm in furtherance of a drug trafficking crime, all related to the February 9, 2018 encounter" on March 20, 2018. *Id.* at ECF p. 11-12. "On May 23, 2022, the federal court accepted DuPage's guilty plea to the first and third counts of the indictment (possession of methamphetamine with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime)" and DuPage

---

[5] "DuPage's gun was determined to be a black Sterling .22 caliber pistol with one round in the chamber and five live rounds in the magazine." *Id.* at ECF p. 10.
[6] At no point did Butler activate his taser or use his service weapon. *See* (D. 133 at ECF p. 7, 9 & 24).

"was sentenced to 156 months in the Bureau of Prisons on his guilty plea related to the February 9, 2018 arrest." *Id.* at ECF p. 12.

## A

In Count One, the Plaintiff alleges that the Defendant illegally seized him in violation of the Fourth Amendment by "ordering [him] to stop walking" without probable cause and without a warrant on February 9, 2018. (D. 89 at ECF p. 1-2). The Defendant argues that it was a consensual encounter that turned into a valid detention and arrest. (D. 133 at ECF p. 15). For the reasons that follow, the Court agrees that the Defendant's acts did not constitute an illegal seizure under the Fourth Amendment.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures". U.S. Const. amend. IV. "This case concerns the 'seizure' of a 'person,' which can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "A seizure occurs when, considering all of the circumstances, a reasonable person would not feel free to leave, decline the officers' requests, or otherwise terminate the encounter." *United States v. Palomino-Chavez*, 761 F. App'x 637, 642 (7th Cir. 2019) (citing *Florida v. Bostick*, 501 U.S. 429, 436-39 (1991)). "If a reasonable person would feel free 'to disregard the police and go about his business,' no seizure has occurred." *United States v. Ahmad*, 21 F.4th 475, 479 (7th Cir. 2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). To succeed in establishing an unlawful seizure claim pursuant to § 1983, the plaintiff must establish: (1) that the government actor's conduct constituted a seizure; and (2) that the seizure was unreasonable. *See Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (citing *Bielanski v. Cnty of Kane*, 550 F.3d 632, 637 (7th Cir. 2008)). A "'seizure does not occur simply because

9

a police officer approaches an individual and asks a few questions'". *Long v. United States*, 847 F.3d 916, 921 (7th Cir. 2017) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Indeed, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "'Determining whether a seizure has occurred is a highly fact-bound inquiry,' but a number of circumstances may be relevant, including: whether the encounter occurred in a public place or the police moved the person to a private location; whether the officer told the person that he was free to leave; whether the police limited the person's movement via physical touching, restraint, or other coercive conduct; whether the officer informed the person that he was the target of an investigation; and whether the person was deprived of identification or other vital documents 'without which he could not leave.'" *Ahmad*, 21 F.4th at 479 (quoting *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008)).

In this case, accepting the Defendant's statement of facts as true, he asserts that the encounter was voluntary, and, therefore, there was no seizure—at least initially. (D. 133 at ECF p. 16). Butler states that he "approached DuPage by himself without his service weapon or [t]aser drawn" and "asked DuPage if he had a minute to talk" and then "proceeded to voluntarily converse with Officer Butler." *Id.* at ECF p. 7. The Defendant further points out that he was by himself and the encounter occurred on a public street, without his lights activated, and that DuPage was not moved or cornered. The Court agrees that, at this point, there was no seizure of the Plaintiff. Without more, it did not constitute a seizure for Butler to approach Plaintiff and ask questions. *See Florida*, 460 U.S. at 497.

However, as the situation evolved, Butler was advised by dispatch that DuPage had an active warrant out for his arrest.[7] (D. 133 at ECF p. 16). Once Butler was advised of the warrant, he was authorized to seize the Plaintiff and make the arrest. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *United States v. Leon*, 468 U.S. 897, 920 n.21 (1984). When a judge authorizes an arrest pursuant to such a warrant, probable cause is presumed. *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022). A "plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause." *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009). In this case, Butler was authorized to act on the warrant because, according to Illinois law, unless a geographic limitation is placed on a warrant of arrest, the warrant is "directed to all peace officers in the State" and is executable "anywhere in the State." 725 ILL. COMP. STAT. § 5/107-9(g)(2). Therefore, at this point, Butler was justified in telling DuPage that he was not free to leave and feign that he was still checking to see if he had any active warrants, even though Butler already knew he did.[8] *Id.* Butler continued to converse with DuPage as a way to stall, but DuPage attempted to flee before backup arrived. *Id.* at ECF p. 9-10. Butler was able to apprehend him and place under arrest. *Id.*

Once under arrest, DuPage's person was searched. (D. 133 at ECF p. 28-29). That search led to the discovery of the methamphetamine and the firearm. *Id.* Pursuant to the warrant, "once the arrest was authorized, [Butler's] search of [DuPage] incident to that arrest was undisputedly lawful." *Utah v. Strieff*, 579 U.S.

---

[7] "At no point did Officer Butler tell DuPage he was not free to go prior to dispatch informing Officer Butler of the valid warrant." (D. 133 at ECF p. 8).
[8] It is not a constitutional violation for the Defendant to misrepresent his knowledge as to whether the Plaintiff had an active warrant out for his arrest under these circumstances. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (upholding the police's ability to make misrepresentations in the course of an investigation).

11

232, 233 (2016). Therefore, with these facts in mind, the Court determines that no reasonable jury could find that the Plaintiff was illegally seized and grants the Defendant's Motion for Summary Judgment as to Count One. *See Anderson*, 477 U.S. at 255.

**B**

In Count Two of the Plaintiff's Complaint, he alleges that the Defendant exceeded his lawful authority by using the Law Enforcement Agencies Data System ("LEADS") system to search for criminal history without probable cause and without a warrant and for personal or unofficial reasons in violation of Illinois law, the Illinois Constitution, "privacy acts", and the Fourth Amendment. *Id.* In response, the Defendant maintains "there is no evidence that Butler himself even used the LEADS database" and that, even if he did, it would have been lawful. (D. 133 at ECF p. 20-21). For the reasons that follow, the Court agrees that the Defendant's conduct did not constitute an illegal search under the Fourth Amendment.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he was deprived of a *federal* right, privilege, or immunity by any person acting under color of state law. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005) (emphasis added); *see also Germano v. Winnebago Cnty.*, 403 F.3d 926, 929 (7th Cir. 2005) (Dismissing plaintiff's § 1983 claim and observing that "[f]ailure to implement state law violates that state law, not the Constitution[.]") (citing *C.L. for Urb. Believers v. City of Chi.*, 342 F.3d 752, 767 (7th Cir. 2003)). Accordingly, the only potentially plausible cause of action in this case would be pursuant to the Fourth Amendment. *See id.* However, the Plaintiff has not alleged any facts sufficient to demonstrate the deprivation of any cognizable Fourth Amendment interest. "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create

genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). The Plaintiff has not done so here. Accordingly, the Court grants the Defendant's Motion for Summary Judgment as to Count Two.

C

In Count Three, the Plaintiff alleges the Defendant used excessive force during the arrest on February 9, 2018. (D. 89 at ECF p. 3). The Defendant argues that any use of force in carrying out the arrest was reasonable under the circumstances. (D. 133 at ECF p. 22-25). For the reasons that follow, the Court agrees with the Defendant that the use of force in this case did not violate the Plaintiff's rights.

In this case, the Plaintiff does not identify a specific constitutional right that he is alleging was violated. However, when "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Therefore, because the Plaintiff's claim alleges that the Defendant used excessive force during the arrest, the Court analyzes his claim pursuant to the contours of the Fourth Amendment. "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, but that right is circumscribed by the Fourth Amendment's insistence on reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (internal citations omitted). In general, "an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Id.* By corollary, "[t]he amount of force reasonably required to effectuate an arrest naturally increases when an officer is faced with a resisting or fleeing suspect." *Brown v. Pankow*, 2023 WL 4312775, at *6 (C.D. Ill. 2023). A "police officer's use of force in arresting a suspect violates the Constitution if, judging from the totality of

circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chi.*, 830 F.2d 706, 713 (7th Cir. 1987). This requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* It must include an "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Courts "'give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations.'" *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724-25 (7th Cir. 2013) (quoting *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)).

In this case, the Defendant was aware that the Plaintiff had been arrested one month earlier for possession of drug equipment and methamphetamine. (D. 133 at ECF p. 5). The Defendant had also been advised to use caution because he was "known to carry a gun." *Id.* at ECF p. 6. Indeed, those concerns proved to be true. After the Defendant advised Plaintiff that he was not free to go, he attempted to flee. *Id.* at ECF p. 8. When the Defendant grabbed him by his jacket collar and threw him to the ground, detaining him at taser point, he only resorted to handcuffs after he continued to fidget and disobey Officer Butler's orders. *Id.* at ECF p. 9. DuPage then informed the Defendant that he "had a gun in his pocket" and removed bags containing methamphetamine and lorazepam. *Id.* The Plaintiff's Complaint asserts that Officer Butler used excessive force in throwing him to the ground, pointing a taser at his head, and placing him in handcuffs

14

which caused pain even after the Plaintiff asked the handcuffs to be fixed, alleging it caused permanent damage to his right hand and wrist. (D. 89 at ECF p. 3). However, beyond the Complaint, the Plaintiff has not supported his assertion sufficient to create a genuine dispute of fact. *See Horton v. Pobjecky*, 883 F.3d at 948. To the contrary, because the Plaintiff has failed to respond, the Court accepts the Defendant's statement of facts as true, which state that the handcuffs were kept as loose as possible, but snug enough to ensure the Plaintiff could not harm or threaten anyone else. (D. 133 at ECF p. 11). Moreover, the Defendant states that the Plaintiff did not complain about pain, discomfort, or any medical condition that would be exacerbated by the handcuffs. *Id.* Under these facts, the Court determines that no reasonable jury could find that the Defendant used excessive force during the arrest. *See Anderson*, 477 U.S. at 255. The Plaintiff had already attempted to flee before he was placed in handcuffs, was in possession of a firearm that was loose on the scene, and the officer never activated his taser or used his service weapon even though greater force may have been justified under the circumstances. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm . . . it is not constitutionally unreasonable to prevent escape by using deadly force."). Indeed, the Seventh Circuit has reached the same conclusion on similar facts. *See Tibbs v. City of Chi.*, 469 F.3d 661, 666 (7th Cir. 2006) (affirming grant of summary judgment where Plaintiff complained about the handcuffs being too tight and suffered some discomfort and pain but did not seek medical care for the alleged injury); *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304 (7th Cir. 2011) (affirming dismissal of excessive force claim where Plaintiff did not complain of any injury when taken to jail and did not receive any medical treatment from the use of the handcuffs). Therefore, the Court grants the Defendant's Motion for Summary Judgment as to Count Three of the Complaint.

## IV

For the reasons set forth *supra*, the Defendant's Motion for Summary Judgment (D. 133) is granted and the Plaintiff's Motion for a Stay (D. 148) and Motion for an Extension of Time (D. 150) are denied. The Clerk is directed to enter judgment in favor of the Defendant and close the case.

*It is so ordered.*

Entered on August 12, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE